We'll have counsel in the Neville matter. Good morning. Morning. May it please the court, my name is Brett Farrar. I'm here on behalf of the appellant, Neville Chemical Company, and I would like to reserve two minutes. Very good. Go ahead, sir. Thank you very much. This case involves Neville Chemical Company paying workers' compensation benefits to an injured employee over the course of time. The employee was injured on June, excuse me, June 24, 1993. There were periodic times of employment thereafter. A loss was in... And that was the point that he required surgery for herniated disc, correct? That is correct. He injured his back, Your Honor. Let me ask you this question. Yes. Is occupational disease on one hand and bodily injury on the other, are they mutually exclusive? If we make a finding that this falls within the ambit of occupational disease, that in and of itself is mutually exclusive from a finding of bodily injury here. According... What we're talking about here is we're talking about some terms that are within the policy that's in play here, Your Honor. And, yes, the way that the policy defines bodily injury, or I should say not defines, but discusses bodily injury, it says that it shall not include occupational disease. So with respect to that question, Your Honor, I do believe that we're talking about two different things. We're talking about bodily injury and we're talking about occupational disease being two different things, Your Honor. Right. So you want to look at, I guess the acronym is WCA, right? So there's specific references in the policy to certain terms and those terms refer to the WCA. Like, I guess it's 75, you know, has the permanent total disability definition that refers to the WCA. But with regard to other terms that are an issue in this case, there's no reference to the WCA, right? So my question is, in those instances where there's no specific reference, as there is in 75, why should we, in fact, look to the WCA and not just look to, you know, plain meaning? Yes. Well, I think that the policy itself does refer to the WCA in some instances. You're correct. And in particular, I think what is critical to this, in application of the WCA, if you look at the coverage section of the policy, as well as the loss section of the policy, it is contemplated that, for example, loss, the company will indemnify the insured for loss resulting from an occurrence during this contract period, provided either such loss would be covered under the insurer's qualified self-insured retention plan and whose states are named in the policy, which is Pennsylvania, and the loss would be compensable under the Workers' Compensation Act. That's how coverage is contemplated. Loss is also contemplated, meaning that it will mean that its amounts are actually paid by the insured in payment of benefits under the applicable Workers' Compensation Act. So what we have is we have the policy applying and incorporating the act into it. So particularly in this instance, we're talking about coverage for loss. You'd say incorporated by reference, right? True, but it is specifically referring to the Pennsylvania Workers' Compensation Act. So it is being referred to and incorporated therein. So that rubric is what this policy applies to. Otherwise, really, the policy doesn't make any sense. It's a specific excess workers' compensation policy, and it is attached to something. And that, in this case, is attached to the Pennsylvania Workers' Compensation Act, as stated in the policy itself. In the schedule of the policy, in the declarations of the policy, they're referring to Pennsylvania specifically as the state to which act applies. But if the coverage is... Go ahead. But if the policy says it covers occurrences, and occurrences mean accidents, isn't that pretty much the bounds of the coverage? How is it not? I mean, if there is an accident, then that is an occurrence. And here there were three accidents, correct? Something unexpected happened. So why wouldn't there be three occurrences and not recurrences or aggravated or whatever else there might be, which is nowhere in this policy? Because when you're understanding, if you're applying Pennsylvania workers' compensation law... But we're applying the policy. But the policy itself specifically is applying Pennsylvania workers' compensation statute. That's the question, though. The policy doesn't say that. I'm looking at the definition of what it covers. We will pay in the event of an occurrence. Yes, correct. And it's an accident. But in this instance, the evidence that was provided to the court shows that the occurrence was the 1993 event. And this person's injury, Mr. Kelly, the injured employee, the evidence is such that his injury over time stems from and arises from and relates back to, in part, to that incident, which under the Pennsylvania workers' compensation law is described as a recurrence. And because of that... Well, unfortunately there is no recurrence concept in the excess policy. And recurrence is a recurrence of a prior injury under primary insurance. Here the original injury is a herniated disc for which there was surgery. There were two other accidents or instances, let's say, or occurrences, both of which had to do with degeneration based upon age. So I think you can't really, even if recurrence applied, and I don't know if it does, it's not a recurrence of a prior injury. Because the previous injury was herniated disc for which they had surgery. So how do you say it's recurring when he then does something and it's a degeneration caused by age? What we look at here is we look at the expert medical opinion of the doctors that were associated with Mr. Kelly's treatment over time. And Dr. Weck, for example, as well as Dr. Murata, the company's doctor, they say in their expert opinion that, yes, there is a degenerative aspect to this, but also, in part, his continuing injury relates back to the 1993 incident. Now, what we're talking about here is under Pennsylvania workers' compensation law, that aspect, the burden to disprove that is actually on, in this case, TIG, to show that to not be the case. The evidence that was put forth for the district court showed that, and they did not combat that or counterpart that. So what we have here is we have the district court really essentially failing to acknowledge that, saying we don't need to consider that at all for purposes of this analysis. Let me ask you this question that this is sort of a tag-on to Judge Rendell's question. So first, I need this sort of predicate. You prevail, as you're arguing, if we deem this a bodily injury and one occurrence. Is that right? That's correct. Okay. If we deem this to be cumulative and under the definition of occupational disease in the policy, if we deem this to be cumulative, you don't prevail. Is that right? Well, this goes to one of the errors. No, but just as a theoretical matter, that should be yes or no. Theoretically. On a theoretical basis, that's right, right? Correct. But we dispute the fact that cumulative injuries, as the predicate of your question, the district court, you know, does go into a discussion about occupational disease being defined by cumulative injuries or being the same. And, in fact, the policy doesn't state that. The language of the policy that TIG is relying upon, its own language says that occupational disease shall include cumulative injuries. Now, that is not the same as stating that cumulative injuries equals occupational disease. So that notion is how the district court ends up in the position it does. Well, my question to you is if we look at the 1993 incident, the 2000 incident, and the 2003 incident, right, and deem them based on the medical evidence that's before us and the conclusions that the doctors made at those various times, and we deem that to be cumulative injuries, then it falls within the ambit of occupational disease. Occupational disease is not defined by the term cumulative injury. Occupational disease means something different. For purposes of this analysis of what is an occupational disease when you're paying workers' compensation benefits, that is defined specifically by the Workers' Compensation Act. That's the area that's... We're dealing with your policy. If occupational disease includes cumulative injuries, cumulative injuries, therefore, are occupational diseases under the policy. I don't know how you get around that. Cumulative injuries... I mean, it's not... Occupational disease may include other things, but it specifically includes cumulative injuries. So if you have cumulative injuries, how are you not within the definition of occupational disease, which, of course, has the temporal problem? Because... Well, Your Honor, I understand that's what the district court arrived at, but cumulative injuries... If you think about this, cumulative injuries is the understanding that it's successive in a sense, but cumulative injuries doesn't establish that an occupational disease, in fact, occurred. Because, for example, in this case, the gentleman, Mr. Kelly, injured his back, working with a pump. The fact that he would have multiple injuries over time doesn't make that incident an occupational disease. Well, that incident may have been an occurrence, but thereafter, the other two may have been occupational diseases, if they're not accidents, as you propose, and that presents a problem for you. Well, I think that the term occupational disease, Your Honor, it's a very specifically defined concept that involves things such as asbestos exposure or silicosis or things of that nature, not an injured back as a result of... What does the term conditions of employment refer to? Pardon me? The term conditions of employment, which is in the policy,  I'm looking for that, Your Honor. Does that modify occupational disease? I'm trying to figure out why an accident is an occupational disease. I know you're not arguing that it is. Well, the conditions of employment... The endorsement says bodily injury by disease must be caused or aggravated by the conditions of employment, which seems to me to mean something, a non-accident. Correct. Yes, conditions of employment, and this goes to this notion... Right. A good example would be asbestos exposure. Asbestos. Something along those lines, rather than working on a pump. But isn't that a good reason that occupational disease doesn't say it's only cumulative injury? It shall include leaving open the concept that occupational disease, as we generally understand it, includes also asbestosis, et cetera, et cetera. So the definition isn't limiting as to other things, but it certainly is specific as to cumulative injury. If this policy were to be written... If we look at what you're asking about is comparing the word shall include versus the term shall mean, and the policy does define certain things by saying shall mean. It does not do that with occupational disease. Right, which leaves open the possibility that it also includes what's generally understood as occupational disease, right? It does, but I will state that if TIG wanted this to be... If TIG wanted to define the word occupational disease, it could have done so by saying shall mean, like it did with other portions of this policy, and it didn't. And the court, district court, makes the assumption incorrectly that it does in its analysis. Well, you're saying the incident in 2001 and 2003 were not accidents. They were recurrences in part... Yes, and I'm not just saying that, but there is medical... But the doctors also said at various times that it also was... The doctors do say that they use the word and, recurrence and degenerative problems, but because there was a recurrence, it's not as though that's wiped away. No, these counts... Go ahead. A couple of things I don't understand. Now, you've used the term recurrences, right? So we have the 1993 injury, and you argue as though the 2000 and 2003 incidents are recurrences, but what's the distinction that you're drawing between recurrences on the one hand and cumulative injuries on the other? Because it seems to me that based on the conclusions that the doctors make in their various reports, the, you know, Dr. Murata in December of 2000, Dr. Wyke in 2006, Dr. Warey's in 2020, right? Their references and conclusions make it seem as though this is a cumulative injury. Started with the accident in 93, and I'm not getting the distinction you're attempting to draw between recurrent injuries on the one hand and cumulative injuries on the other. Yeah, a cumulative injury, you know, means that it increases in quantity over time, but it doesn't necessarily mean that the incident from which it arises varies or differs. The aggravation idea or the recurrence idea, those are the two concepts in Pennsylvania workers' compensation, which are opposing one another. The recurrences is that the injury from which it arises, the incident, I should say, from which it arises and that injury involved in that is the same. The aggravation is where it changes and it becomes sort of a new injury, and this is explained in the briefing, in the opening brief of Neville citing to Pennsylvania workers' compensation while distinguishing between those terms for the particular definitions. Mr. Farr, the references to aggravation of preexisting condition and recurrence of prior injury are everywhere in case law involving primary insurance policies. We have an excess policy here that makes no reference to those terms at all. Can you give me a case where the aggravation of preexisting condition or recurrence of prior injury has been embedded or superimposed on an excess insurance situation where the recovery is based upon occurrences and accidents? What's your case that supports that? Yes, Your Honor. I don't have a case cited in the materials, and I can't specifically cite to you one doing that because of these unusual circumstances here. But I will state, and I'm sorry I'm going over my time limit, but I will state that the case upon which Tig relies to talk about this idea of primary versus excess policy, typically what happens, at least in that case, is where you have an excess policy that's of a generalized nature. It might cover a number of things, such as CGL, or it might cover property damage or advertising injury or whatnot, and it's generalized. And in that case, the Cromer case they're talking about, the court determined that that type of excess policy was not converted into a motor vehicle financial responsibility insurance policy. And the rationale for why it did that is set forth in our brief, but basically it was a generalized policy. It had to do with third-party benefits, and it wasn't specific to the issue at hand. This case, however, the case we're talking about here, it's not that case. We have a specific excess workers' compensation insurance policy to cover the very particular loss that we're discussing. Well, except excess coverage really is for catastrophic loss, isn't it? It's for catastrophic loss. It is, but it's for first-party benefits. It's particularly with respect to excess workers' compensation payments. And as a result, it would frustrate the purpose of the policy itself. It wouldn't apply to the amounts paid by the SIR. It is read, but we have more questions. Okay. Here's a couple of questions. Let me ask you this hypothetical. We focus on occupational disease. It's a term we can argue about whether it's defined or is it just mentioned, whatever. But we address that issue first, and we deem that what's happened here are cumulative injuries. So the cumulative injuries fall within the umbrella of occupational disease, right? Is that the end of the inquiry, if we made that determination? I don't think so, Your Honor. Okay. So we've made the determination that these are cumulative injuries. What else is there for us to decide? You need to understand what that means in terms of what the policy is intended to cover, which is losses and coverage under the Pennsylvania Workers' Compensation Act. And when you look at that act and how that works, you come to the conclusion that just because it's cumulative doesn't necessarily control the outcome because the Workers' Compensation Act law will show that it was a reoccurrence and, therefore, as a result, the payments that were made in connection, first, with the self-insured retention amount by Neville, that loss. But really what this case is about is the amounts that are paid above that self-insured retention loss that they're continuing to pay, all arising out of the 1993 incident, are covered by the policy. So in order for us to come to the conclusion that you've just outlined, we have to adopt the following notion, that this policy is governed by the WCA and that all things related to the policy, we should apply the WCA. Because if that's not what we do, I don't understand why we don't stop if we come to the notion that these are, in fact, because my understanding of the, I don't have an intimate understanding, I'm sure you do, but my understanding is if we deem this to fall within occupational disease, at least from Neville's standpoint, that's the end of the inquiry. Well, for reasons stated in the briefing, I don't think that that's what you should do, obviously. Right. But I do think that the policy itself is contemplated as operating and working within the rubric of the Workers' Compensation Act. Yes. Well, let me ask you this question. I asked about excess. You said that we can't just stop with cumulative injuries because we then have to look at recurrence. What case do you have that says that we have to do that? I can't find any case that says, oh, but, even though it's a cumulative injury under the policy, you still have to drill down further under workers' comp law and say, oh, is it a recurrence? Because if it is, then it really isn't a cumulative injury under the policy. Because in order to trigger and calculate the amount of... I mean, I need a case, if you have one. I'm sorry, Your Honor, again. If I had a specific case to talk about in these circumstances, it would be in the brief. But the way... I mean, I don't think these circumstances are all that unusual. But, Your Honor, the way to calculate the SIR, the self-insured retention amount, in order to get the number of what has been incurred as the loss and to do that calculation, it's necessarily dependent upon whether or not there is a recurrence. Because the idea that there are multiple recurrences and none of them would reach the SIR is the idea that is being argued by Tig in this matter. The argument that's being stated by Neville, based upon the evidence that's submitted, is that there is a recurrence and therefore the calculation of the SIR in reaching that amount of $500,000 is the proper method. But in either method, you need to look at and calculate the SIR based upon what would or would not be one occurrence or multiple occurrences. So in order to do that, you need to understand how the SIR works for purposes of payment under this policy, which was paid under the Pennsylvania Workers' Compensation Act. And the way that that works is you look at whether it's a recurrence or aggravation. Otherwise, you can't make the calculation. It's a necessary element of the calculation. And the court, the district court, ignores that principle. They say it doesn't matter. It's wrong. Judge Rendell has asked you for cases. I'm going to ask you for cases on the following point. You want us to essentially import the WCA into this policy. It should essentially govern the policy. I'd love you to tell me a case Pennsylvania's Supreme Court would do nicely that says when a policy makes no reference to the WCA other than specific references, you should import the WCA as to the entire policy. Because so many times today, you've referenced the WCA. Well, you know, if this happens, you should refer to the WCA. If this happens, you should refer to the WCA. When, in fact, there are specific references to the WCA, which, you know, just on sort of basic interpretation doctrines, you'd say, well, if the WCA is referenced in these specific instances, that means, and it's not referenced in other specific instances, in those other specific instances you should merely look to plain meaning and have at it. So help me on that point. Cases that, yeah, I don't have a specific case, Your Honor, but I don't know if you need it in this instance because I'm looking at the policy itself and in the sections that are critical to this analysis, meaning coverage, loss, and the idea of the, in the declarations stating which, stating that Pennsylvania workers' compensation law is what this applies to. What we're talking about here is we're talking about whether the coverage exists for the loss that has been incurred by Neville. And those portions of the policy, meaning Part 1 coverage, subparts 1 and 2, the definition of loss, which is in Part 4, subpart E, those are specifically referring to the Pennsylvania Workers' Compensation Act. When we've had this discussion today, and I've referred to the Workers' Compensation Act, it may have sounded as though I'm just saying generally in the ether, in the sky, there is application of the Workers' Compensation Act. And I apologize if my comments made you think that. It very well may be that case, but I don't even know if you need to get that for it because the portions of the policy that we are talking about that are critical to this decision specifically talk about the Workers' Compensation Act and the payments being made or coverage being made under that. It's specific to this question. It's not necessarily an ethereal idea for purposes of the argument that this case is about. Your Honor, I seem to have gone well past my allotted two minutes for the purposes of the rebuttal. And I can wait a minute. Don't concede that. Come on. Okay. I didn't want to overstep. You don't want to do that. We might want you back on rebuttal. Have a seat. Okay. I didn't want to overstep my bounds. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Chris Hasselhoff on behalf of TIG Insurance Company. Your Honors, this is a straightforward coverage case involving a proper interpretation of TIG's excess workers' compensation policy. I'm always worried when you start with straightforward. Under Pennsylvania law, interpretation of contracts is a matter of law for the Court. This policy is unambiguous. The District Court did an excellent job of analyzing the two types of possible occurrences under this policy. Your Honors, under the excess policy, there's two types of potential occurrences that could lead to coverage. The first is by accident in the case of bodily injury, and the second is occupational disease. And the policy is very specific in the definition of occupational disease, that occupational disease does include cumulative injury. Whether or not the Workers' Compensation Act would include cumulative injury as an occupational disease is irrelevant for purposes of determining whether or not coverage applies under the excess policy. What do we look to to understand cumulative injury? Your Honors, as the District Court did, we looked to the definition of the two words, cumulative and injury, and put that together and measured that against the undisputed facts in this case. And the undisputed facts in this case, as the District Court analyzed them, could go either through an occurrence by accident or an occurrence by occupational disease. And the District Court looked at both and said that under either scenario, no coverage applies. Because the policy was only in effect, the excess policy at issue here was in effect from January 1, 1989 until January 1, 1994. The undisputed facts show that Mr. Kelly sustained a workplace accident on June 23, 1993. He was installing a hot metal pump, bent over, and injured his back. That resulted in a herniated disc, which he had surgery performed by Dr. Bagai in February of 1994. He was off until 1995. And then in 1995, he had a sporadic return to work, a couple months on, a couple months off. But by January of 1996, Dr. Bagai, through four separate work releases, gradually released Mr. Kelly back to work unrestricted. From essentially February of 1996 until December 28, 2000, Mr. Kelly went to work. Neville paid no benefits whatsoever. And there were Gates McDonald, Neville's third-party administrator, closed their claim on the underlying workers' compensation claim. So there's a gap of five years where no benefits were paid. And then on December 28, 2000, Mr. Kelly was again injured at work. He was working in an awkward position. And when he got up, he couldn't straighten his back. Why isn't that a recurrence? That is an accident. Whether it's a recurrence or an aggravation under this policy is irrelevant. And I think to answer the court's question, we have to understand the difference between the policies behind the Workers' Compensation Act and excess insurance. The Workers' Compensation Act governs the payments and the circumstances under which either a primary workers' compensation insurer, or in this case, Neville as a qualified self-insurer under the Workers' Compensation Act, would remit payments of benefits to his injured employees. So the injured employees under Pennsylvania's workers' compensation scheme, they give up the rights to sue and potentially more lucrative tort actions in exchange for the swift workers' comp benefits in the form of wage loss and medical benefits. And doesn't it, if it's a recurrence, then doesn't the benefit get paid at the rate of the original injury? Whereas if it's an aggravation, then the benefits under the primary policy or whatever get paid at that then prevailing rate. That's correct, Your Honor. I'm sorry, Your Honor? I said so it has an impact for the purpose of the employer. Yes, Your Honor. It has an impact for the purposes of the employer. And that's the difficulty in what Neville's position is there under workers' compensation law. If it's a recurrence, the rate dates back to the original 1993 injury. So recurrence and aggravation, if you consider those terms, they really define or relate to an injury. Is this an old injury or a new injury? The policy coverage is not triggered under the policy unless there is a loss that results from an occurrence and that loss from the occurrence exceeds the $500,000 self-insured retention and the occurrence or the event occurs within the policy period. So let me ask you this question. As we go through our analysis, do we determine whether this is an occupational disease in the first instance or do we look at the question of bodily injury in the first instance? Your Honor, I think the district court analyzed the issue appropriately by going down both paths and looking at this from the perspective of really trying to find coverage. But when you look at the facts of this case, there is no single occurrence for which the loss, the self-insured benefits paid exceeded the $500,000 SIR. And the record shows that all of the loss, and I think it's important to, loss here, loss occurs to the insured. The occurrence, the injury, that occurs or that happens to the insured's worker. So if you analyze the facts of this case under the rubric of the insurance policy, the 1993 occurrence, Mr. Kelly installing the pump and injuring his back, relating in surgery, all of the loss that Neville paid on that, the record is very clear, the total loss in connection with that occurrence was $75,000. Then in 2000, December 28, 2000, like I said, there was a five-year gap from that original occurrence to the second occurrence, which occurred December 28, 2000. At that time, Mr. Kelly, the evidence at appendix 323, there's a supervisor's report, Neville's supervisor's report very clearly indicates that Mr. Kelly was working in an awkward position, he stood up, he couldn't straighten his back. That's a new event. That new occurrence resulted in loss to Neville in the form of Neville being required to pay workers' compensation benefits from January 8, 2001 to January 31, 2001. Is that new event an accident? Yes. Yes, it is, Your Honor. And Pennsylvania law is very clear on that point in Coverner that accident is not an ambiguous term under insurance policies. Accident is an unforeseen, unexpected event. And the working in an awkward position and then not being able to straighten your back up, that is a new event. Much in the same way as in 2003. In July of 2003, when Mr. Kelly was, the record shows he was toying around or playing around with a pump and he injured his back again, which was ultimately the injury that put him out of the workforce. That is a third occurrence or a third event. And what Neville, whether you look at it from the accident by bodily injury occurrence or the occupational disease, which Neville is arguing that it's a recurrence and it's the same injury, it's the same injury. As the district court pointed out, even if it's the same injury, under the policy definition of occupational disease, there's no coverage because occupational disease is defined by the policy as one separate occurrence and the policy also states that the separate occurrence happens on the date that the injured employee was last exposed to the work conditions giving rise to the injury. Regardless of which analysis the court looks at this through, if it's occupational disease, by definition under the policy, the occupational disease occurred on July 22nd, 2003. The policy had lapsed years before that. If the court analyzes the occurrence by bodily injury through accident, Neville failed to satisfy the self-insured retention for any single injury. I asked your colleague for cases. What case do you have for the proposition that in this situation, this excess policy with defined terms, that we don't look to recurrence or aggravation at all? Your Honor, I think the best case for that, and it certainly is not binding on this court, we cite to it in our brief, the super value case, what Neville is asking is for this court to hold that one underlying workers' compensation claim equals one occurrence under the policy, and that is not by definition how this policy is constructed. The policy makes one or two references to the Workers' Compensation Act, and I'd like to address that because it's under the definition of loss, and loss here is defined as actual benefits paid under the applicable workers' compensation act. In satisfaction of judgments, your Honor, that's a threshold issue. This is a specific excess workers' compensation policy. So it goes without saying that the loss for which TIG could potentially be obligated to reimburse is a workers' compensation based loss. In other words, if Neville were making voluntary payments to its favorite employee, that certainly wouldn't be a loss covered under this policy. CGL and other types of losses are not covered under this policy. So the reference to the WCA in the excess policy is a threshold matter, and further, the reference in the declarations to the WCA is specifically Pennsylvania's state WCA under which benefits must be paid in order for there to be a loss. But loss is only the beginning of the analysis. In order for there to be coverage, the loss has to be tied to a specific occurrence, again, which occurred within the contract period, so in this case, Honor, before January 1st, 1994, and for which the loss related to the single occurrence exceeds $500,000. And on the record before this court, there's no evidence to suggest that that occurred. Give me a, let's work with a hypothetical for a moment, right? So we have an accident in July of 93, right? And we have subsequent events for which they're now seeking recommendations. Yep. So give me an example of a series of events which would result in liability for TIG. Okay, Your Honor. Yeah, I think there's three off the top that are pretty clear. One is if the accident in 1993 resulted in death or, you know, permanent disfigurement. The worker would never go back to work. That's one for sure. I think the second one would be, you know, a permanent injury. That's one because it would exceed $500,000, right? Right, assuming that the individual, yeah. The $500,000 SIR is the main reason why there's no coverage here, because there's no single event that resulted in a loss to Neville in excess of $500,000. So I guess I caveat my response with I'm assuming that that individual who died would have sustained, you know, would have been entitled to wages or medicals in excess of $500,000. The second one would be, let's not take the death situation, but maybe look at the 2003 accident here. And again, TIG did not have an excess policy in effect at that time. The record is unclear as to whether Neville has another insurance company. But from 2003 to present, Mr. Kelly has been receiving approximately $868 biweekly for the last 19 years. And I think that's an important, you know, distinction to make, is there may be an excess carrier, not TIG, that will eventually be responsible, whoever had the excess policy in effect for Neville at the time of the 2003 accident. That is a possible route of excess coverage for Neville. But that does not, you know, in any way change the facts before this court. No, no. I didn't explain myself. I gave you a hypothetical. I don't want you to tie it to Neville, right? I want you to give me a hypothetical where you'd be liable, right? Death, clearly. Yeah. If that employee never goes back to work and he sustains those payments for a successive period of time, when the loss hits $500,000 from that 1993 injury. Okay. That's the second. And what's the third? So there's no circumstance in which there's any sort of intermittent either accident or intermittent recurrence or anything like that in which liability for TIG would result. Is that right? Yes, Your Honor. I just saw them over my time. May I respond to the question? Yes, please. Wouldn't it be if the policy were still in effect over all these years? Then there'd be cumulative injuries that would amount to that, right? The cumulative injury, yes. It depends on when the employee last was exposed to the work conditions because that's what is the date of occurrence for a cumulative injury. So I think to answer Your Honor's hypothetical, I think one in your circumstance, we probably have to be under the bodily injury by accident scenario. And if there were certain gaps, then I think you would need to look at the facts and circumstances. But in this case, what we've got is such a gap in time that it's abundantly clear. And the district court was well within its rights, given that both parties have conceded that there are no disputed facts. The medical records are clear here. But I think that does answer it. If the employee never goes back to work, at some point, presumably, he or she would hit an SIR, and the occurrence occurred within the policy period, then it would, the loss can extend beyond the end contract date, but the occurrence must happen within the policy period. I thought the appellant was saying or was disputing that there were no accidents in 2001 and 2003. Am I wrong on that? I think what the appellant, and it's a little bit of linguistics here, I think what the appellant is saying is that it's the same injury. Something caused that, which is my point. There was an event, and under the TIG policy, a separate event triggers a separate SIR. What I believe appellant is arguing is under workers' compensation, under the WCA, that maybe Neville was appropriate to treat all of the injury as recurring back to the 1993 accident. But that analysis under this policy is irrelevant, because as soon as we have another accident, that triggers a new self-insured retention, and the record shows that there is no single occurrence for which Neville satisfied the $500,000 SIR. Judge Rendell, anything further? I have nothing further, thank you. See, you have something to say, why give up your two minutes? Thank you very much, I'll be very brief with respect to this. Regarding the idea that occupational disease is defined by the policy, it's not. If you look at the policy terms, it's not defined by the policy. It says it shall include, while other parts of the policy that do define things say shall mean, for example, statutory shall mean loss in excess of any retention applicable in this agreement. It's the structure of the policy itself. It's under definitions. Headings in the policy aren't conclusive. If you look at the language, some of these definitions say shall mean, some say shall include, regardless. With respect to this idea of suspension of benefits paid, Case Law discusses that. It says if there is a suspension of benefits paid, that's not determinative, in the sense that if the employee comes back thereafter and is injured subsequently, if it relates back to that initial injury, that does not mean that it is a new occurrence for purposes of calculating the SIR. And we cited that in the brief, it's the McNulty case. Counsel, a question here about occurrence and aggravation. Isn't the work that they do under the policy and in the law, isn't it limited to determining the benefits that are paid by the employer? In other words, if it is a recurrence, the rate at which the benefits are paid, dates back to the original injury. So that the employer gets a bonus, if you will, if they're deemed to be a recurrence. Not a bonus, but it's obviously more beneficial to the employer. But if it's an aggravation, then the benefits are paid at the employee's rate at that time. Isn't that the work that those concepts really do? And really, aren't they misplaced when you come to a situation where it's an excess policy and we're not trying to determine what benefits the person is going to get as a result of an event? Well, it is true that the rate can vary as you described. But for purposes of that being a determinative factor, I think it's really irrelevant because the cost of whatever the SIR, however you calculate up to the SIR and to the amount of the SIR, whether you're using one of those two numbers, you still reach the SIR and it's a $500,000 amount. And whether you get there more quickly than slowly, it really doesn't matter. In this case, the $500,000 amount was met and they are paying in excess of it currently right now. But by the same token, what work do those concepts do under an excess policy? Really, no work. The loss is whatever was paid by the employer. This different differentiated rate that arises under a primary policy, it doesn't do any work under an excess policy. Well, I also think the argument that's made by TIG with respect to this in the briefing that somehow, you know, Neville was benefited because they're calculating it based upon a 1993 date. It's really an irrelevant argument. It doesn't make any difference. Thank you. Yes. Thanks so much. Thank you very much. Thank you, counsel, for the fine arguments. And we'll take the matter under advisement. And I believe that's all.